UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DARRYLL L. NOWAK,

                          Plaintiff,        **No. 1:15-cv-00424-MAT**
                                            **DECISION AND ORDER**

              -vs-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                          Defendant.
_____

## I. Introduction

Represented by counsel, Darryll L. Nowak ("Plaintiff")
instituted this action pursuant to Titles II and XVI of the Social
Security Act ("the Act"), seeking review of the final decision of
the Acting Commissioner of Social Security ("the Commissioner")[1]
denying his application for Disability Insurance Benefits ("DIB")
and Supplemental Security Income ("SSI"). The Court has
jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g),
1383(c).

## II. Procedural Status

Plaintiff protectively filed applications for DIB and SSI on
May 3, 2012, alleging disability commencing May 1, 2012. His
applications were initially denied August 10, 2012. On

_____

[1]
    Nancy A. Berryhill became the Acting Commissioner of Social Security on
January 20, 2017. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil
Procedure, Nancy A. Berryhill should be substituted, therefore, for Acting
Commissioner Carolyn W. Colvin as Defendant in this suit. No further action need
be taken to continue this suit by reason of the last sentence of section 205(g)
of the Social Security Act, 42 U.S.C. § 405(g).

September 18, 2013, administrative law judge David S. Lewandowski ("the ALJ") conducted a hearing in Buffalo, New York, at which Plaintiff appeared with his attorney and testified, as did impartial vocational expert Esperanza DiStefano ("the VE"). On December 26, 2013, the ALJ rendered an unfavorable decision. (T.7-25).[2] On March 25, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final determination. Plaintiff then timely commenced this action.

Plaintiff and Defendant have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The Court will discuss the record evidence further below, as necessary to the resolution of the parties' contentions. For the reasons set forth herein, the Commissioner's decision is affirmed.

## III. The ALJ's Decision

The ALJ applied the five-step sequential evaluation promulgated by the Commissioner for adjudicating disability claims. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since May 1, 2012, and that he meets the Act's insured status requirements through September 30, 2015.

---

[2] Citations to "T." in parentheses refer to pages in the certified administrative transcript.

At step two, the ALJ assessed Plaintiff as having one "severe" impairment: lumbar degenerative changes. The ALJ determined that Plaintiff's major depressive disorder, post-traumatic stress disorder ("PTSD"), and history of polysubstance abuse were not "severe" impairments because they do not cause more than minimal limitations in his ability to perform work related activities.

At step three, the ALJ found that Plaintiff's impairments, considered singly or in combination, do not meet or medically equal a listed impairment, including Listing 1.04 (Disorders of the Spine).

Prior to proceeding to step four, the ALJ assessed Plaintiff as having the residual functional capacity ("RFC") to perform a range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that he is limited to occasional climbing, balancing, stooping, kneeling, crouching, or crawling; can frequently perform overhead activities; and requires a sit/stand option that can be exercised every 15 minutes.

At step four, the ALJ determined that Plaintiff cannot perform his past relevant work as a maintenance mechanic, production laborer, assembler, and assembler supervisor.[3]

---

[3]

Plaintiff stopped working as a mechanic for a chocolate manufacturer on March 17, 2010, due to corporate downsizing and his decision not to take a 20 percent pay-cut.

At step five the ALJ relied on the VE's testimony to conclude that, given his age, education, work experience, and RFC, he can the following representative occupations:

(1) File Clerk (Dictionary of Occupational Titles ("DOT") 206.387-034, light exertion, semi-skilled (SVP 3), with 680 positions regionally, 11,730 positions in New York State, and 158,580 positions nationally); Hotel Desk Clerk (DOT 238.367-038, light exertion, semiskilled (SVP 4), 730 positions regionally, 8,490 positions in New York State, and 229,000 positions nationally); and Companion (DOT 309.677-010, light exertion, semi-skilled (SVP 3), with 6,340 positions regionally, 127,860 positions in New York State, and 985,230 positions nationally).[4] Accordingly, the ALJ found that Plaintiff had not been under a disability as defined by the Act during the relevant period.

## IV. Scope of Review

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the

---

[4]
The Commissioner points out that in his step five finding, the ALJ cited the VE's testimony that there were 3 <u>semi-skilled</u> jobs that Plaintiff could perform, but mistakenly stated that transferability of skills was <u>not</u> material to that finding. (T.18-19). The Commissioner notes that Plaintiff has not raised this issue on appeal. In any event, as the Commissioner argues, any error was harmless, because the VE also identified 3 representative <u>un</u>skilled jobs that he could perform. (T.54-55). <u>See</u> 20 C.F.R. §§ 404.1568(d), 416.968(d); SSR 82-41, 1982 WL 31389 (S.S.A. 1982); SSR 83-10, 1983 WL 31251 (S.S.A. 1983); <u>Bavaro v. Astrue</u>, 413 F. App'x 382, 385 (2d Cir. 2011) (unpublished opn.) (recognizing that an unskilled job is viable at step five regardless of any transferability of skills from previous job) (citation omitted).

decision is based on legal error.  42 U.S.C. § 405(g); see also Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). The district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quotation omitted).  The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides.  Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)).

## V.  Discussion

### A.  Failure to Develop the Record in Connection with the Step Two Severity Determination and Erroneous Weighing of Treating Source Opinions (Plaintiff's Point III)

Plaintiff contends that the ALJ erred at step two in determining that his mental impairments (major depressive disorder, PTSD, and history of polysubstance abuse) are not "severe" impairments. Plaintiff faults the ALJ for not recontacting his

treating social worker or obtaining an additional consultative psychiatric examination. For the reasons discussed below, the Court finds that the ALJ did not fail to develop the record, and that the ALJ's step two finding was supported by substantial evidence.

At step two, the ALJ must determine whether the claimant has "a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 404.1509, or a combination of impairments that is severe and meets the duration requirement." Cichocki v. Astrue, 534 F. App'x 71, 73–74 (2d Cir. 2013) (unpublished opn.). The Regulations provide that "[a]n impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521 (eff. until Mar. 27, 2017). "Basic work activities . . . mean the abilities and aptitudes necessary to do most jobs[.]" Id. As relevant to mental impairments, "[b]asic work activities" include "(3) [u]nderstanding, carrying out, and remembering simple instructions; (4) [u]se of judgment; (5) [r]esponding appropriately to supervision, co-workers and usual work situations; and (6) [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b) (eff. until Mar. 27, 2017).

As discussed further below, the ALJ correctly weighed consultative psychologist Dr. Renee Baskin's report, which provides substantial evidence to support the ALJ's step two finding. In

addition, the ALJ correctly weighed the report of treating therapist Rachel C. Lauria, LMSW ("LMSW Lauria")which was vague, incomplete, and, in any event, fails to support Plaintiff's argument that the ALJ's step two finding was erroneous.

### 1. Erroneous Weighing of Consultative Psychologist's Report and Failure to Request Second Consultative Examination

Plaintiff argues that the ALJ erroneously gave significant weight to the opinion (T.280-83) of Dr. Baskin, who conducted a consultative psychiatric examination of Plaintiff on July 6, 2012. Plaintiff reported some apprehension and worry, and dysphoric moods, but he denied nightmares, flashbacks, or any other PTSD symptoms. (T.280-81). He also denied manic symptomatology, thought disorder symptomatology, or cognitive symptomatology/deficits. (T.281). Dr. Baskin noted that Plaintiff was cooperative, responsive to questions; his manner of relating, social skills, and overall presentation all were adequate. (Id.). Plaintiff's affect "was of full range and appropriate in speech and thought content[;]: his mood was "pleasant, polite, personable, and easily engaged." (T.281-82). Plaintiff's attention and concentration were intact, as were his recent and remote memory skills. (T.282). Dr. Baskin estimated that Plaintiff's intellectual function was in the low average range, and his general fund of information was appropriate to his experience level. (Id.). For her medical source statement, Dr. Baskin opined that with regard to his vocational

functional capacities, Plaintiff has "minimal to no limitations being able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others and appropriately deal with stress." (Id.). According to Dr. Baskin, Plaintiff's "psychiatric problems" were "not significant enough to interfere with [his] ability to function on a daily basis." (T.283).

Dr. Baskin's report finding "minimal to no limitations" in his ability to perform the types of basic work activities typically affected by mental impairments is consistent with Plaintiff's own statements in the record about his symptomatology. In a function report submitted with his disability applications, Plaintiff stated that he had trouble remembering where he put things, such as minor misplacements of objects, but he had no problems paying attention. (T.159-60). Although he was not always able to finish what he started because pain caused him to take breaks from physical activity, he was able to follow spoken and written instructions, and he had no problems getting along with people in authority. (T.159-60). He admitted that, at the time, he was not receiving any treatment for his pain apart from taking Meloxicam, a non-steroidal anti-inflammatory medication. (T.161-62). Plaintiff went outside, usually on a daily basis, and he was able to go outside by himself.

(T.155). He traveled by walking and using public transportation, and shopped in stores for groceries and other items twice a month. (T.156). He attended class at Erie County Community College ("ECC") 3 to 6 days per week during the summer, and 6 days per week while school was in session. (T.157). He spent time weekly with family members. Plaintiff stated that his anxiety symptoms were now controlled by medication that he received from his general practitioner and mindfulness/relaxation techniques that he had previously learned in treatment. (T.162-63). His panic attacks now occurred "very seldom." (T.163). His anxiety did not result in any difficulties in socializing with others. (T.164). Indeed, as compared to this function report, Plaintiff reported fewer symptoms related to his depression, anxiety, and PTSD during his subsequent examination with Dr. Baskin.

Plaintiff notes that Dr. Baskin's assessment was conducted only 2 months after he filed his disability applications, and argues that his condition worsened throughout the disability period. This contention is belied by the record, including Plaintiff's testimony at the September 18, 2013 administrative hearing. Plaintiff testified that he had started working at a bowling alley as a pin-setter mechanic and general handyman on September 13, 2013, for 8 to 9 hours per week. Plaintiff stated that he could "only concentrate for short periods of time, half hour, 45 minutes max before the pain and the anxiety begin to set

in," and he has to take a break. (T.44). When asked about his anxiety specifically, Plaintiff did not describe any particular symptoms, but responded that he thought that his anxiety came "from the years of drug and alcohol abuse and it just set in at that point where [he's] still learning how to cope with life." (T.44). As far as his PTSD, he said he has "[s]light flashbacks now." (T.45).

Plaintiff further testified that he was attending school at Buffalo State College ("BSC") for electrical engineering, mechanical engineering, and computer information systems. (T.47-49). He attended classes Monday through Friday, and had 1 to 3 classes per day, with breaks in between. R47-48. Prior to that, he had attended ECC for 2 years, and he was on the Dean's List for 3 of 4 semesters. (T.48-49). At the time of the hearing, he had not received grades yet for the current semester, but he thought he was doing "fairly well." (T.49).

Dr. Baskin's report is also consistent with other evidence cited by the ALJ. The treatment records from primary care physician Dr. Antonia Redhead between May 2012, and June 2013, document that Plaintiff had a normal mood and affect. When he complained of depressive symptoms, he rated them as only mild in severity. (T.361). The mental health treatment records from Lake Shore Behavioral Health Franklin Counseling Clinic ("Lake Shore Clinic") show improvement in Plaintiff's symptoms by July 2013, when he was

noted to be working part-time and attending school. Plaintiff reported increased self-esteem as the result of his increased social and vocational activity, along with a marked reduction in symptoms of trauma and depression. (T.388-90). Since Plaintiff appeared stable, the frequency of his visits to the Lake Shore Clinic was reduced from weekly to every 2 weeks. (T.388, 392). A treatment plan prepared at Lake Shore Clinic indicated that Plaintiff's strengths included his abilities to work part-time and attend school. (T.392).

Where there are "no obvious gaps in the administrative record," and the ALJ already possesses a "complete medical history," the Second Circuit has consistently held that the ALJ is under no obligation to seek additional information prior to rejecting a disability benefits claim. E.g., Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999). The administrative transcript here contains all of Plaintiff's treatment records. As discussed above, they do not demonstrate a worsening of Plaintiff's mental health condition over time. There is thus no indication that the opinion offered by consultative psychologist Dr. Baskin had become stale in the intervening period. Under these circumstances, the Court finds the ALJ did not fail in his duty to ensure there was a complete record on which to base his decision.

## 2. Erroneous Weighing of Treating Social Worker's Report

On April 15, 2013, Plaintiff's treating therapist, Rachel C. Lauria, LMSW ("LMSW Lauria"), submitted a letter indicating that Plaintiff had received treatment at the Lake Shore Clinic since March 11, 2013, but he was not prescribed medication through that provider. (T.398). She stated that Plaintiff had "difficulties related to his mental health diagnosis that interfere with his daily functioning." However, she noted that the clinic "cannot provide adequate information related to questions posed on this form [Mental Medical Source Statement] and do not observe or have any opportunity to determine how a person responds in a work environment." (T.398). Accordingly, LMSW Lauria only partially completed the attached Mental Medical Source Statement. (T.399-404). She only answered the questions on 1 page, and struck through the portions of the form requesting that she provide ratings regarding Plaintiff's mental abilities and attitudes needed to do unskilled work, semi-skilled, and skilled work, his stress tolerance, and his likely rate of absenteeism due to his mental impairments. Thus, LMSW Lauria's report substantively is of very little utility. The only "opinion" she provided—that Plaintiff has "difficulties related to his mental health diagnosis that interfere with his daily functioning"—is too vague to be of any use in assessing Plaintiff's RFC. Finally, LMSW Lauria is not an acceptable medical source under the Regulations, and her opinion is

not a "medical opinion" entitled to controlling weight even when it concerns an impairment within the realm of her expertise. See <u>Diaz v. Shalala</u>, 59 F.3d 307, 314 & n.8 (2d Cir. 1995).

**B.    Erroneous Weighing of Treating Physician's and Consultative Physician's Opinions (Plaintiff's Points I and IV)**

A treating physician's opinion on the issues of the nature and severity of a claimant's impairments is accorded controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record. <u>See</u> 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); <u>Halloran v. Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004). When an ALJ declines to accord a treating physician's opinion controlling weight, he must consider several factors, including the length, nature and extent of the treatment relationship; the frequency of examination; the supportability of the opinion; the consistency of the opinion; and whether the treating source is a specialist. See 20 C.F.R. § 404.1527(c)(1)-(6); § 416.927(c)(1)-(6). These factors are also to be considered with regard to non-treating acceptable medical sources, such as consultative physicians and psychiatrists. <u>See</u> 20 C.F.R. § 404.1527(a)(1), (c), (e); 20 C.F.R. § 404.1513(a)(1), (2) (eff. until Mar. 26, 2017); 20 C.F.R. § 416.927(a)(1), (c), (e); 20 C.F.R. § 416.913(a)(1), (2) (eff. until Mar. 26, 2017).

Here, on October 15, 2013, Plaintiff's treating primary care physician Dr. Antonia Redhead completed a form titled, "Lumbar Spine Medical Source Statement." (T.406-09). She noted she had treated Plaintiff for lower back pain every 3 months over the course of 3 years. With regard to the clinical findings that show Plaintiff's impairments, she listed MRI findings of "disc degeneration at L5-S1 facet hypertrophy at L3-L4 [with] disc bulge, narrowing bilateral neural foramina." (T.406). Plaintiff argues that the results of this MRI is only consistent with a finding of disability, but in a form submitted to the Social Security Administration on January 11, 2013, in response to a question regarding what his doctors had told him about his back condition, Plaintiff stated that "no direct indication has been given from the MRI." (T.201). Furthermore, Dr. Redhead's characterization of the MRI findings is misleading, since she omitted the words qualifying the degree of abnormalities seen. Namely, the degenerative changes were "mild;" the disc bulging was "mild" and "diffuse;" the narrowing of the neural foramina was "mild to moderate at L4-L5;" and while there was "moderate narrowing of the bilateral neural foramina" at L5-Sl, there was "no significant spinal canal stenosis." (T.336-38).

Asked to identify Plaintiff's symptoms, Dr. Redhead listed "severe back pain with limited range of motion [and] anxiety." (Id.). She opined that Plaintiff would be able to walk 4 city

blocks without resting or severe pain, sit for 30 minutes at a time, stand for 30 minutes at a time, sit for about 4 hours in an 8-hour day, stand for about 2 hours in an 8-hour day, requires a sit/stand option, needs to walk for about 10 minutes at a time every 30 minutes, will need 2 to 3 unscheduled 10- to 15-minute breaks a day, does not need to elevate his legs when sitting, can occasionally lift 10 pounds, can never twist or climb ladders, can occasionally stoop (bend) and crouch/squat, and can frequently climb stairs. (T.407-08). The foregoing limitations assessed by Dr. Redhead are not necessarily indicative that Plaintiff is disabled. In particular, her opinions that Plaintiff could occasionally stoop (bend) and crouch/squat, and frequently climb stairs, are consistent with the ALJ's RFC finding. (T.15, 408). Moreover, although Dr. Redhead opined that Plaintiff needed the ability to sit and stand at will, she also stated that Plaintiff could sit for 30 minutes before needing to get up, which is consistent with the ALJ's inclusion of a sit/stand option that could be exercised every 15 minutes. (T.17, 407). In addition, Dr. Redhead estimated that Plaintiff could stand for 2 hours total, walk for 2 hours total, and sit for 4 hours total in an 8-hour day. While this level of physical exertion is more restrictive than the ALJ's RFC finding for a range of light work with a sit/stand option, the ALJ reasonably concluded that Dr. Redhead's opinion was

not well-supported by her clinical findings and was inconsistent with the medical record.

For instance, on May 1, 2012, his alleged onset date, Plaintiff presented to Dr. Redhead to follow up regarding his psoriasis and PTSD; he had "no new complaints." (T.275). Dr. Redhead noted that Plaintiff had normal gait and station, was able to rise in a single motion, and had no reports of back pain. (T.275-76). Although lower back pain was listed as one of Plaintiff's diagnoses, he was not prescribed any medication or treatment for back pain. (T.276-77). Two months later, on July 6, 2012, Plaintiff presented for a consultative internal examination with Hongbiao Liu, M.D. (T.284-88), and reported "constant" "sharp" neck and back pain rated at a 7 to 8, without radiation to the legs, which was "secondary to the [sic] sports activity when he was 15 years old." (T.284). On examination, Dr. Liu observed lumbar spine flexion and extension to 75 degrees, lumbar lateral flexion to 15 degrees on the right and left, and lumbar rotary movement to 15 degrees on the right and left.[5] Straight leg raising was positive bilaterally (supine and sitting). (T.286). Plaintiff had

---

[5]

Basic ranges of motion for the lumbar spine are as follows: flexion (80 to 90 degrees), extension (30 degrees), lateral flexion (20 degrees), and rotation (45 degrees). <u>See</u> http://www.ssas.com/disability-medical-tests/musculoskeletal/range-of-motion-test/ (last accessed Nov. 28, 2017). Thus, Plaintiff's flexion and lateral flexion ROMs are only 5 degrees below the "normal" range. His extension ROM appears to be greater than normal, but that is perhaps a typographical error by Dr. Liu and should instead read 15 degrees. His rotary movement ROM is 30 degrees less than "normal" but, overall, his lumbar spine ROMs are not far from "normal."

full range of motion in his hips, knees, and ankles bilaterally, and full range of motion in his shoulders, elbows, forearms, and wrists bilaterally. He had full strength in his upper and lower extremities bilaterally, intact hand and finger dexterity bilaterally, and full grip strength bilaterally. (T.286). An x-ray of the lumbar spine on July 16, 2012 was negative. (T.286). Plaintiff had no difficulty getting on and off the examination table, needed no assistance changing, used no assistive devices, and was able to rise from the chair without difficulty. For his medical source statement, Dr. Liu opined that Plaintiff has "mild to moderate limitation for his routine activities" and "*should try* to avoid lifting, carrying, bending, and overhead reaching." (T.287) (emphasis supplied). Dr. Liu did not specify what was meant by "routine activities."

The ALJ assigned "some weight" to Dr. Liu's report, which Plaintiff contends supports an RFC for less than sedentary work. According to Plaintiff, Dr. Liu opined that Plaintiff should "avoid lifting, carrying, bending, and overhead reaching[,]" (Plaintiff's Brief at 16 (citing T.287)). Plaintiff argues that "these restrictions on lifting, carrying, and bending clearly prevent [him] from performing even a sedentary job." (Id.). However, Plaintiff misquotes Dr. Liu's report, which was much more equivocal; Dr. Liu actually stated that Plaintiff "*should try* to avoid lifting, carrying, bending, and overhead reaching." (T.287)

(emphasis supplied). Moreover, a limitation totally precluding Plaintiff from lifting, carrying, bending, and overhead reaching would not be consistent with Dr. Liu's essentially normal clinical findings and observations, discussed above. And, such a restrictive limitation would not be consistent with Dr. Redhead's opinion or Plaintiff's own statements about his daily activities.

### C. Failure to Consider Social Security Ruling Regarding Use of Handheld Assistive Device (Plaintiff's Point II)

Plaintiff contends that the ALJ erred by not specifically considering Dr. Redhead's opinion that Plaintiff required a cane for occasional standing or walking, and by not specifically considering TITLES II & XVI: DETERMINING CAPABILITY TO DO OTHER WORK–IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, SSR 96-9p, 1996 WL 374185 (S.S.A. July 2, 1996).

SSR 96-9p addresses the effect of a "[m]edically required hand-held assistive device," such as a cane, on occupational the base of sedentary work. For a cane to be deemed "medically required," the claimant must produce "medical documentation establishing the need for a handheld assistive device to aid in walking or standing, and describing the circumstances for which it is needed, (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7. SSR 96-9p states that "[t]he adjudicator must always consider the particular facts of a case." Id. From this sentence, Plaintiff extrapolates that "an

ALJ must make a specific finding when a claimant needs to use a cane or other assistive device for more than just prolonged ambulation." (Plaintiff's Brief at 18). The Court is doubtful that SSR 96-9p imposes the fact-finding requirement articulated by Plaintiff, but even if it did, there is not substantial evidence in the record supporting a finding that Plaintiff's use of a cane is "medically required," or that it significantly eroded the occupational base of sedentary work.

Dr. Redhead stated in her RFC opinion that Plaintiff required a cane for "occasional" standing or walking. However, Dr. Redhead's clinical findings during her physical examinations of Plaintiff indicate that he had a normal gait and the ability to rise from sitting to standing in a single motion. (See, e.g., T.275-76, 317, 319, 323, 325, 334, 336, 358, 360, 361, 363, 365, 367). Moreover, she does not mention that Plaintiff is using a cane; nor do her treatment notes indicate that she has issued a prescription for a cane. Likewise, Plaintiff did not use any assistive device during Dr. Liu's July 6, 2012 consultative examination, and Dr. Liu did not state that Plaintiff required the use of a cane. Notably, the one occasion on which was Plaintiff specifically was prescribed a cane was in connection with his May 2013 diagnosis of onychomycosis (fungal infection of the toenails) and subsequent surgical removal of his toenails—not for his lumbar back pain. (T.366).

SSR 96-9p specifically notes that "[s]ince most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand." SSR 96-9p, 1996 WL 374185, at *7 (footnote omitted). As an example, SSR 96-9p posits "an individual who must use a hand-held assistive device to aid in walking or standing . . . to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers." Id. This hypothetical individual describes Plaintiff's situation. He stated in his June 6, 2012 function report that he used a cane only as necessary, specifically, "when need [sic] to assist in getting to places." (T.15-16, 159). Plaintiff also testified that he was performing work as a pin setter mechanic at a bowling alley for 8 or 9 hours one day a week; although he stated that this work activity exacerbated his back pain, he did not that his ability to perform this work was impeded by the use of a cane. In addition, Plaintiff attended college throughout the relevant period, which required him to walk to get to his classes; at the time of the

administrative hearing, he was attending classes 5 days per week. In sum, the record does not contain substantial evidence supporting Plaintiff's argument that his occasional use of a cane significantly eroded the occupational base for sedentary work. Any error by the ALJ in not making a specific factual finding therefore is harmless.

## VI. Conclusion

For the foregoing reasons, the Court finds that the Commissioner's decision was not legally erroneous and is supported by substantial evidence. It therefore is affirmed. Accordingly, Defendant's motion for judgment on the pleadings is granted, and Plaintiff's motion for judgment on the pleadings is denied. The Clerk of Court is directed to close this case.

**SO ORDERED.**

S/Michael A. Telesca

_____

HON. MICHAEL A. TELESCA
United States District Judge

Dated:      November 29, 2017
            Rochester, New York.